UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ROBERT CORNETT, JR.

    Plaintiff,

v.                             Case No.: 8:06-cv-02386-T-17TBM

CITY OF LAKELAND, and
LILA BENNETT,

    Defendants.
_____/

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The cause before the Court is the defendants', City of Lakeland and Lila Bennett, Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. Doc. 25. Plaintiff Robert Cornett, Jr. filed a response to the motion. Doc. 34. A review of the record indicates that, for the following reasons, the defendants' motion for summary judgment should be **GRANTED** in favor of the City of Lakeland and **GRANTED** in favor of Lila Bennett.

PROCEDURAL BACKGROUND

On December 27, 2006, plaintiff, Robert Cornett, Jr. (Cornett), filed a complaint and demand for a jury trial against defendants, the City of Lakeland (City) and Lila Bennett (Bennett), in the U.S. District Court for the Middle District of Florida. Doc. 1. Cornett's complaint alleged that police officer Bennett, of the City of Lakeland Police Department, used excessive force in arresting him, in violation of the Fourth and Fourteenth amendments of the United States Constitution. Doc. 1, U.S. Const. amend. IV. U.S. Const. amend. XIV. Cornett filed a 42 U.S.C. 1983, claim against Bennett, in her official capacity, based on the City's alleged failure to adequately train Bennett. Cornett also filed a 42 U.S.C. 1983 claim against Bennett, in

her individual capacity, seeking declaratory relief that Bennett violated his Constitutional rights and praying for compensatory damages. Doc. 1 at 5-9.

This Court issued a summons as to the City of Lakeland on December 27, 2006, and a summons as to Bennett on February 16, 2007. Doc. 2, Doc. 11. The City filed its answers and affirmative defenses on February 7, 2007. Doc. 4. Included in the City's answer was a Notice of Special Appearance by Bennett presenting her affirmative defenses. Doc. 4 at 3. The following day, February 8, 2007, the City filed a Motion to Strike and/or Motion to dismiss Cornett's (1) allegations of Fourteenth Amendment violations relating to the incident and (2) prayer punitive damages against the City of Winter Haven. Doc. 7. Thereafter, Cornett voluntarily severed these same portions of the complaint. Doc. 10.

Defendants City and Bennett filed a motion for summary judgment and supporting memorandum on October 12, 2007. Doc. 25. The City and Bennett submitted the depositions of Bennett, Cornett, Cornett's former girlfriend Rhoda Fowler (Fowler), Lakeland police officers Billy Joe Lane (Lane) and Sergeant David Woolverton (Woolverton), and the affidavit of Lieutenant Joseph Henson (Henson) in support of their motion. Doc. 25-31. Cornett filed a response and supporting memorandum opposing the motion but submitted no additional evidence. Doc. 34. The parties have mediation scheduled for July 25, 2008. Doc. 39.

## FACTUAL BACKGROUND

The following facts are assumed true for the sake of this motion:

On April 10, 2005, Lakeland Police Department (LPD) officers encountered Cornett in the parking lot of a Super 8, located motel off of Memorial Boulevard in Lakeland, Fl. Doc. 27. Cornett was driving an Isuzu Trooper that had been reported stolen by Leanne Lott on April 7, 2005. Doc. 27 at 7. The officers attempted to block Cornett's path as he was leaving the motel.

Doc. 27 at 9. Cornett went around the police car, hit a chain link fence, and fled down Memorial Boulevard in the stolen vehicle. Doc. 27 at 10. Thereafter, on April 11, 2005, an arrest warrant was issued for Cornett on charges of burglary to a conveyance, grand theft of a motor vehicle, fleeing or attempting to elude, and leaving scene of crash involving property damage. Doc. 27 at 57.

On April 19, 2005, LPD officers arrived at Rhoda Fowler's (Fowler) home in Lakeland, Fl, to execute the arrest warrant on Cornett. Officer Billy Lane (Lane) and Officer Benitez went to the front door as Sergeant Woolverton (Woolverton) and Bennett, with her canine Keito, watched the back of the house. Doc. 30, Doc. 26. Cornett dated and lived with Fowler at the time. Doc. 27 at 5. Cornett and Fowler were in the back bedroom of the house getting intimate when the police officers arrived. Fowler's roommate, "Hollywood," was also home. Doc. 27, Doc. 28 at 18. Officer Lane "pounded" on the front door and announced, "Lakeland Police Department." Doc. 29. Fowler answered the door as Cornett remained in the back bedroom to dress himself. Doc. 27 at 28-29. Cornett instructed Fowler to tell the police he was "giving up." Doc. 27 at 18-19. Fowler told Lane that Cornett was still in the house, "hiding in the closet," and was unarmed. Doc. 28 at 19, Doc. 29 at 22-23. Lane then asked Fowler and Hollywood to step outside.

From the front door, Lane announced his presence and asked Cornett to come out of the bedroom. Doc. 29 at 19. After hearing no response from Cornett, Lane communicated with Woolverton via radio. Bennett and Keito were sent to the front of the house to assist in apprehending Cornett. Doc. 29 at 23-24. Approximately two minutes later, Bennett and Keito arrived at the front door. Doc. 29 at 22-23. Bennett spoke briefly to Fowler and to confirm that Cornett was the only individual left in the house. Doc. 28 at 27. Cornett responded to LPD's

announcement with, "I'm back here; I'm coming out; my hands are up." Doc. 27 at 19, 42. Cornett stepped into the hallway with his hands up, saw Keito running towards him, froze, and waited for instructions from Bennett. Doc. 27 at 19-20. Bennett was right behind Keito with her gun in the air. Doc. 27 at 19-20. As Keito jumped toward Cornett, Cornett turned around 180 degrees to protect the front of his body. Doc. 27 at 20. Keito lunged forward, knocked into Cornett, and nipped his backside. Doc. 27 at 20. Cornett stepped back into the bedroom to avoid the attack. Doc. 27 at 21. Keito bit him once on the back of his right thigh and released. Bennett ordered Cornett to the ground and Cornett complied. Doc. 27 at 21-22. Then, Keito again bit the back of Cornett's right thigh, this time "pulling on" Cornett's leg. Doc. 27 at 22-23. Keito continued to bite for five to ten seconds before Bennett handcuffed Cornett. Doc. 27 at 22. Five to ten seconds after Bennett successfully handcuffed Cornett, Bennett ordered the dog to release. Doc. 27 at 23.

Cornett remained on the ground in handcuffs as other police officers entered the bedroom. Doc. 27 at 23. Cornett alleged that a Spanish officer came in, kicked him in the head, and exclaimed, "whoops." Doc. 25 at 4. Additionally, Cornett claimed that Bennett and other members of LPD treated him with disrespect throughout the arrest. Doc. 25 at 4-6. After approximately 30-35 minutes, Cornett got up from the floor and made his way to a police car. The police car took him to the hospital, where he received treatment for his wounds and he was, thereafter, transported to the jail. After two days in jail, Cornett received antibiotics for his injury. Cornett plead no contest to the charges contained in the arrest warrant. He has served a thirty-six month sentence for the April 10 motel parking lot incident.

Cornett filed the instant lawsuit against the City and Bennett for the use of excessive force during his arrest. It is Cornett's position that the City's failures to train, supervise, and

control Bennett during her employment was the proximate cause of his attack. Doc. 1 at 6. Cornett further alleges that Bennett, in her individual capacity, used an amount of force that was "excessive, unjustified, and unreasonable" in violation Cornett's Fourth Amendment right to be free from unreasonable and unlawful seizure. Doc. 1 at 8. As a result of the attack, Cornett claims he suffered from permanent and severe physical injuries, emotional distress, bodily pain and discomfort, humiliation, embarrassment, disfigurement, and loss of enjoyment of life; incurring past and future medical expenses as well as loss of earning, wages, and earning capacity related to the incident. Doc. 1 at 7-8. Cornett seeks compensatory damages, lawsuit costs, and other relief the Court may deem appropriate from the City and Bennett. Doc. 1 at 7-8.

## STANDARD OF REVIEW

At the summary judgment stage, the court's role is to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986). A granting of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. Anderson, 477 U.S. 242 at 249. A dispute is genuine if the evidence could lead a reasonable jury to return a verdict for the nonmoving party. Id. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

Federal Rule of Civil Procedure 56 permits the plaintiff or the defendant to move for summary judgment. Fed. R. Civ. P. 56. The moving party carries the initial burden of showing

no genuine issue of material fact exists. This is done by producing evidence outside of the pleadings. One way the moving party may discharge its burden is by a showing that there is an absence of evidence to support the nonmoving party's case. Fed. R. Civ. Pr. 56(c), <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986). Once the moving party has made and supported its motion, the burden shifts to the nonmoving party to show that a disputed issue of material fact exists. The nonmoving party's response "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). A genuine issue of material fact is established when the non-movant has presented enough evidence to show that a reasonable jury could find in its favor. <u>Anderson</u>, 477 U.S. 242 at 248.

The plaintiff must produce evidence establishing the essential elements of the case that he must prove at trial. <u>Celotex</u>, 477 U.S. 317 at 322-323. Accordingly, where the defendant has moved for summary judgment, the defendant can show that he is entitled to judgment as a matter of law because the existing record contains no evidence to support an essential element of plaintiff's case. <u>Id.</u> All evidence and factual inferences drawn from the evidence are viewed in the light most favorable to the non-moving party. <u>United States v. Diebold, Inc.</u>, 269 U.S. 654, 655 (1962).

DISCUSSION

Section 1983 of the United States Code allows civil actions against any person who, acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia" deprives another of rights guaranteed by federal laws or the Constitution. 42 U.S.C. § 1983 (LEXIS 2006). Under this statute, governmental employees can be held liable in their individual and official capacities for any violations of rights they commit. Monell v. New York City Dep't. of Social Services, 436 U.S. 658, 665 (1978).

Here, Cornett filed 42 U.S.C. 1983 claims against the City and Bennett for the violation of his constitutional right to be free from unreasonable search or seizure. Defendants City and Bennett filed a motion for summary judgment on both claims, along with supporting depositions and an affidavit. Cornett filed a response opposing the motion. Because Cornett has failed to produce evidence establishing his failure to train, supervise, and control claim against the City, the defendants' motion for summary judgment on Count I of the complaint is **GRANTED**. Because Lila Bennett is entitled to qualified immunity for actions committed within the scope of her employment at the Lakeland Police Department, the defendants' motion for summary judgment on Count II of the complaint is **GRANTED**.

I.   Plaintiff's 42 U.S.C. §1983 Excessive Force Claim

Section 1983 of the United States Code provides a civil remedy for the deprivation of any rights, privileges, or immunities, secured by the Constitution and federal laws, by a person acting under color of statute, ordinance, regulation, custom or usage of any state, territory, or the District of Columbia. Persons found to be in violation of this statute are liable to the party injured party at law, in equity, or other proper proceeding for redress. 42 U.S.C. § 1983. Section 1983 does not confer a particular substantive right; rather, it provides a broad remedy for the

violation of federally protected rights. Samarco v. Neumann, 44 F. Supp. 2d 1276, 1284 (S.D. Fla. 1999). Thus, to establish a claim, the plaintiff must bring the § 1983 claim in conjunction with another statute or Constitutional provision which provides the right. Id.

Here, Cornett claims Bennett violated his Fourth Amendment right "to be secure in their person . . . against unreasonable seizures." U.S. Const. Amendment IV. Protection against the use of excessive force by law enforcement falls under the Fourth Amendment. Graham v. Connor, 490 U.S. 386, 389 (1989). To prove a Fourth Amendment violation, Cornett must show that a seizure occurred and that the force used in effectuating the seizure was greater than necessary. Samarco, 44 F. Supp. 2d 1276 at 1284-1285.

The use of police canines to apprehend suspects is not excessive force per se. Samarco, 44 F. Supp. 2d 1276 at 1285. Rather, police officers are permitted to use the amount of force that is objectively reasonable carry out the arrest, in light of the circumstances present at that time. Id. Whether the force used by the police officer was reasonable is usually a question reserved for the jury. However, a court may grant summary judgment if it determines that the evidence, viewed most favorable to the plaintiff, shows that force was reasonable under the circumstances surrounding the arrest. Id. The "totality of the circumstances" examined include the severity of the crime at issue, whether the suspect posed an immediate safety threat, and whether the suspect was actively resisting or attempting to evade arrest. Graham, 490 U.S. 386 at 396 *citing* Tennessee v. Garner, 471 U.S. at 8-9 (1985). Because the reasonableness test is purely objective, in light of all facts and surrounding circumstances, the arresting officer's underlying intentions or motivations are ignored. Graham, 490 U.S. 386 at 397, *citing* Scott v. United States, 436 U.S. 128 at 137-139 (1978).

II. Motions before the Court

A. Defendants' motion for summary judgment on §1983 claim against Lila Bennett, in her official capacity.

The Court first considers Cornett's §1983 claim against the City for its failures to train, supervise, and control Bennett. To establish his claim, Cornett must show that the inadequacy of training that caused his attack was an official policy or custom of the City. That is, the failures amounted to "deliberate indifference to the rights of persons with whom the police came into contact." City of Canton v. Harris, 489 U.S. 378 at 388 (1989). Cornett has failed to present evidence establishing his failure to train claim.

A §1983 claim against a defendant in their official capacity is essentially a claim against the governmental entity of which the defendant is an agent. Trammell v. Thomason, 2008 U.S. Dis. LEXIS 44210 (M.D. Fla. 2008). Under §1983, municipalities cannot be held liable for the actions of their employees on the basis of respondeat superior. Monell, 436 U.S. 658. Instead, the plaintiff must show that an official policy or custom of the municipality was the "thrust" behind the constitutional or statutory violation. City of Cannon, 489 U.S. 378 at 385. The plaintiff need not show that the custom or policy itself was unconstitutional, only that execution of the policy caused the deprivation of rights. Id. at 387. Moreover, it is not enough to show that an employee applied a constitutional policy in an unconstitutional manner. Id.

Accordingly, failure to adequately train police officers can only be the basis for § 1983 liability when that failure reflects a conscious choice made by the municipality. City of Canton, 389 U.S. 378 at 389. Specifically, the inadequacy of training must amount to "deliberate indifference to the rights of persons with whom police officers come into contact." Id. Only where the failure to train rises to the level of "deliberate indifference" can it can be considered an

official custom or policy of the municipality. Id at 389. The plaintiff must submit evidence of a pattern or series of incidents to subject a governmental entity to liability; proof of one or two incidents is not enough. Samarco, 44 F. Supp. 2d 1276 at 1288, *citing* Cornfield by Lewis v. School Dist. No. 230, 991 F.2d 1316, 1317 (7th Cir. 1993).

The Court considers whether the City's training program as a whole was inadequate. City of Canton 489 U.S. 378, 392. In its motion for summary judgment, the City submitted evidence that Officer Bennett and Keito were properly trained and credentialed under the standards of the Lakeland Police Department (LPD), the Florida Department of Law Enforcement, and the United States Police Canine Association. Doc. 31 at 3. Along with successfully completing a 400-hour training school, Bennett and Keito were required to certify annually according to the State and United States Police Canine Association standards. Doc. 26, Doc. 31. Included in these standards were proficiencies in "recalling" (stopping the K-9 before it engages the suspect) and "calling off" (directing the K-9 to release the suspect). Patrol dogs were required to demonstrate obedience, agility, article and suspect search, and criminal apprehension. Lakeland Police Department's General Order for K-9 Procedures (Order) was revised in 2005 and accredited by the Commission on Accreditation for Law Enforcement Agencies. Doc. 31 at 2.

Amongst other procedures, the Order requires canine handler's to yell a verbal warning prior to releasing a dog to search a building. The warning identifies the handler as a member of the LPD, gives the suspect an opportunity to announce his presence and surrender, and warns the suspect that failure to surrender will result in a police dog being released to "find and bite" the suspect. Canines are permitted to search buildings where "there is probable cause to believe that a felony suspect . . . may be concealed within a structure or conveyance." Doc. 30 at 41.

Canine utilization and "subsequent bite justification" is authorized: (1) where the canine handler and/or dog has been or is being assaulted; (2) during an authorized tracking exercise wherein a suspect offers active physical resistance; (3) during an authorized building search wherein a suspect has concealed themselves and the canine team is the primary search unity of a structure or conveyance; (4) during the authorized apprehension of a fleeing suspect where a suspect is engaged in active physical resistance; (5) all situations where it becomes necessary to prevent imminent or serious bodily injury to an officer, citizen, or canine by an offender; and (6) under certain circumstances when a canine locates a hidden suspect and the "bite" cannot be prevented by the handler (e.g., spontaneous bite). Doc. 30 at 40. Situations in which a bite is not justified are: (1) to effect the arrest of a highly intoxicated or feeble person who obviously cannot escape; (2) to intimidate, coerce, or frighten any individual; (3) to apprehend a subject who has committed a non-criminal traffic infraction; and (4) in the apprehension of any suspect whose efforts to resist law enforcement officers is non-violent in nature. Doc. 30 at 40-41.

The decision of whether to use the canine in particular operation "is the responsibility of the handler." Doc. 30 at 40. Also included in the K-9 procedures are Post Bite Guidelines, requiring police to ensure that the bitten gets proper medical attention, document the injury in photographs and in writing, report the incident to supervisor. Doc. 30 at 42.

The City submitted to the court evidence showing that LPD's training procedures met state and national standards. Doc. 31 at 2. Bennett and Keito were in compliance with the requirements and standards of LPD at the time of the incident. Id. In his affidavit, Lt. Henson testified that LPD's decision to call in the K-9 to assist in Cornett's apprehension was appropriate. Specifically, Henson noted that the "use of a K-9 is a non-lethal use of force and provides the best safety for the suspect, and the arresting officer" Doc. 31 at 1.

The burden shifts to Cornett to show a disputed issue of material fact regarding the adequacy of the City's training procedures. Cornett must go outside the pleadings to establish his claim that the City failed to properly train and supervise its canine officers. City of Canton, 389 U.S. 378 at 389, Samarco, 44 F. Supp. 2d 1276 at 1288. Cornett submitted no evidence of the City's failure to train and admitted he has no evidence to support the allegation. Doc. 27 at 45. Additionally, Cornett has not presented evidence of any other incidents to show a pattern or series of deficiencies in the City's training program. Therefore, Cornett has failed to establish a disputed issue of material fact upon which § 1983 liability could be found. Accordingly, the City's motion for summary judgment is **GRANTED** as to Count I.

B. Defendant Lila Bennett's Motion for Summary Judgment

The Court next considers Cornett's § 1983 claim against Bennett in her individual capacity. Lila Bennett was working under the authority of the LPD at the time of the incident. Therefore, Cornett must overcome Bennett's right to claim qualified immunity to bring his claim to trial. Cornett must show that Bennett violated a clearly established constitutional right by acting in a manner that no reasonable, well-trained police officer would have. Because the record does not support this finding, Bennett is protected by qualified immunity.

Under § 1983, government officials who have violated rights conferred by federal statutes or the Constitution may be sued in their individual capacities. Because of qualified immunity, however, public officials are ordinarily shielded from personal liability for actions undertaken during their employment. Qualified immunity enables public officials to carry out their jobs effectively without the fear of a lawsuit. The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." Samarco 44 F. Supp. 2d 1276 at 1290-91, *citing* McCoy v. Webster, 47 F.3d 404, 407 (11th Cir. 1995) (quoting Malley v. Briggs, 475 U.S. 335,

341). In general, qualified immunity is the rule and will only be overcome in exceptional cases. Samarco. 44 F. Supp. 2d 1276 at 1291, *see also* Lassiter v. Alabama A & M Univ., Bd. of Trustees, 28 F.3d 1146, 1149 (1994).

To establish qualified immunity, Bennett must show that she was acting within the scope of her discretionary authority when the injurious conduct occurred. Samarco, 44 F. Supp. 2d at 1291. Discretionary authority includes "all acts taken pursuant to the performance of the official's duties, which are within the scope of his authority, including ministerial acts." McCoy v. Webster, 47 F.3d 404, 407 (11th Cir. 1995), *quoting* Rich v. Dollar 841 F.2d 1558, 1564 (11th Cir. 1988). Bennett is a certified K-9 officer and was on duty when the incident occurred. Moreover, the City's Order explicitly states that it "the decision to apply a police canine to a specific police operation is the responsibility of the handler." Doc. 30 at 40. Thus, the Court finds she was plainly acting within the scope of her discretionary authority.

With discretionary authority established, the burden shifts to Cornett show that qualified immunity is not appropriate. Trammell. 2008 U.S. Dis. LEXIS 44210 *citing* Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). Namely, Cornett must show that Bennett violated clearly established constitutional or statutory law in carrying the alleged harmful conduct. Determining whether an official violated clearly established law turns on: (1) whether a violation of currently applicable constitutional or statutory law occurred; and (2) whether the right guaranteed by the law was clearly established at the time the incident. 49 Ala. L. Rev. 941, Samarco. 44 F. Supp. 2d at 1291. The court examines the situation from the perspective of a reasonable officer at the scene, rather than with the 20/20 vision of hindsight. Samarco, 44 F. Supp. 2d at 1291 *citing* Hutton v. Strickland. 919 F.2d 1531, 1537.

1. Whether Bennett violated of currently applicable statutory or constitutional law

Although police officers are permitted to use some force in making an arrest, the use of excessive force by a police officer is a constitutional violation. Graham, 490 U.S. 386 at 396. *See also* McKinney v. Dekalb County, 997 F.2d 1440, 1443 (11th Cir. 1993) *citing* Gilmere v. City of Atlanta, 774 F.2d 1495, 1500-02 (11th Cir. 1985), *cert. denied,* 476 U.S. 1115 (1986). After McKinney, all police officers are expected to know that the use excessive force in arresting suspects is a Fourth Amendment violation. Samarco, 44 F. Supp. 2d at 1292. Because there is no bright line test for determining what amount of force is excessive, the court looks at the factual circumstances surrounding the arrest. Id. These factors include the severity of the crime the suspect is alleged to have committed, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is attempting to flee or evade arrest. Graham, 490 U.S. 386 at 396.

LPD arrested Cornett on felony warrants for burglary to a conveyance, grand theft of a motor vehicle, fleeing or attempting to elude, and leaving scene of crash involving property damage. Doc. 27 at 57. None of these crimes are inherently violent and Cornett was unarmed at the time of his April 19 arrest. Nonetheless, it is undisputed that he was in the back bedroom when police arrived. Under these circumstances, LPD would not have known whether Cornett was armed or not. Cornett told Fowler to tell LPD that he was "giving up." After hearing the "only" police warning from the LPD, "Robert we know you're in there, come out," Cornett responded "I'm coming out with my hands in the air." As Cornett stepped into the hallway to surrender, he saw Keito coming towards him. According to his testimony, Cornett was in the hallway with his hands in the air when Keito lunged at him and bit him. Keito bit Cornett two more times during

the incident, including for five to ten seconds after Bennett handcuffed Cornett. Cornett did not attempt to flee or evade arrest.

Looking at the Graham factors and taking the facts in a light most favorable to Cornett, Cornett has alleged sufficient evidence for a reasonable jury to conclude that Bennett's use of force was excessive. Nonetheless, even if Bennett's use of force was excessive, Cornett's right to be free from excessive force must have been "clearly established" at the time of the incident to overcome Bennett's qualified immunity.

2. Whether the law was "clearly established" at the time of incident

For a right to be "clearly established," "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987), *see also* Hope v. Pelzer, 536 U.S. 730, 739 (2002). In excessive force claims, the plaintiff can show the right was "clearly established" in two ways: (1) "a controlling and materially similar case declares the official's conduct unconstitutional;" or (2) "the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." Pace v. City of Palmetto, 489 F. Supp. 2d 1325, 1335 (M.D. Fla., 2007), *citing* Priester v. City of Riviera Beach, 408 F.3d 919, 926 (11th Cir. 2000). For the purpose of overcoming qualified immunity, the "controlling and materially similar case" must come from the Supreme Court of the United States, the Eleventh Circuit Court of Appeals, or the highest court of the State whose law is at issue. Pace, 489 F. Supp. 2d at 1335 *citing* Hamilton v. Cannon, 80 F.3d 1525, 1531 (11th Cir. 1996).

In Pace and Trammell, federal district courts in Florida recognized there is no controlling case holding the use of a police canine unconstitutional per se. 489 F. Supp. 2d, 2008 U.S. Dis.

LEXIS 44210. Cornett cites <u>Kerr</u> to support his position that Bennett should be denied qualified immunity. <u>Kerr v. City of West Palm Beach</u>, 875 F.2d 1546 (11th Cir. 1989).

In <u>Kerr</u>, three plaintiffs sued two West Palm Beach Police Department (WPBPD) officers for the use of excessive force. In the first incident, plaintiff Josh Terrell (Terrell) was asleep in bushes in a yard when police began to search the area for a burglary suspect. Officer Pontieri (Pontieri) of the WPBPD directed his dog Sultan to "get 'em." The dog bit and locked on to Terrell, dragging him out of the bushes. Pontieri then hit Terrell over the head with a flashlight and allowed Sultan to bite Terrell again. Terrell was not the suspect police were searching for. In the second incident, Pontieri pulled plaintiff Jimmy Jerome Arnold (Arnold) out of a tree because he suspected Arnold of stealing fishing equipment. Pontieri then permitted Sultan to bite and lock onto Arnold's arm. Arnold pled guilty to stealing the fishing equipment. In the third incident, plaintiff Uwaine Kerr (Kerr) was followed by WPBPD Officer Chesnut (Chesnut) in a park at night. Kerr exited the park and paused to urinate on the side of a building, at which point Chesnut released his police canine Nick to attack Chesnut. No charges were filed against Kerr. The plaintiffs in <u>Kerr</u> presented evidence that the WPBPD's canine units were more aggressive than average. Namely, that their "bite-ratio" was higher than normal and that the department was aware of such problems. The jury found the officers and the WPBPD liable for excessive use of force, and the Eleventh Circuit Court of Appeals affirmed.

<u>Kerr</u> does not hold the use of the police canines in apprehension of suspects unconstitutional per se. Rather, the jury found the use of the canines under those factual circumstances to be excessive. The facts <u>Kerr</u> are distinguishable from the instant case. In <u>Kerr</u>, none of the three plaintiffs were being apprehended under a felony arrest warrant. Moreover, the use of physical force in <u>Kerr</u> far exceeded the amount of force used by Officer Bennett, even crediting Cornett's

version of the facts. Pontieri hit Terrell over the head with a flashlight and pulled Arnold out of a tree and allowed Sultan to attack him. Chesnut ordered Nick to attack Kerr even though he had no reason to suspect Kerr had committed a crime. Bennett released Keito to apprehend Cornett and then handcuffed him. The facts of this case are distinguishable from Kerr and compel the Court's conclusion that Bennett's conduct was not unconstitutional under the Eleventh Circuit's holding in Kerr.

In the absence of case law deeming the conduct unconstitutional, Bennett is only liable if her conduct was so far outside the "hazy area between acceptable and excessive force" that any reasonable officer standing in her shoes would have known it was unlawful. Preister, 408 F.3d 919 at 926. Bennett, a trained canine handler, entered the house under the direction Lane and Woolverton to arrest Cornett. Because Cornett was in the back bedroom, Bennett had no way of knowing whether Cornett was armed. Bennett released Keito before Cornett stepped into the hallway to surrender. Doc. 27 at 19-20. Although Keito's contact occurred after Cornett surrendered, Bennett's split-second decision was aimed at protecting her, and the other LPD officers, from potential harm. This, along with evidence submitted, supports the conclusion that Bennett acted as a reasonable officer on the scene would. Doc. 31 at 2-3. The Court finds that Bennett's decision to utilize Keito in apprehending Cornett was not irrational under the circumstances.

The alleged conduct of police officers after the incident is immaterial to determining whether Bennett's use of force was so excessive was to make qualified immunity unavailable to her. Looking at the facts as Cornett has presented them, the Court concludes that Bennett was acting within the scope of her discretionary authority, as any reasonable police officer on the scene may have acted, and is, therefore, entitled to qualified immunity. Accordingly, it is

ORDERED that the motion for summary judgment (Doc. 25) be **GRANTED** and the Clerk of Court is directed to enter judgment for the Defendants and against the plaintiff and to close this case.

DONE and ORDERED in Chambers, in Tampa, Florida this _10th_ day of July, 2008.

ELIZABETH A. KOVACHEVICH
United States District Judge

CC: All parties and counsel of record.